

**FILED**
NOV 16 2012
U.S. COURT OF
FEDERAL CLAIMS

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

RICHARD P. WATSON,

Plaintiff,

v.   12-785 C

THE UNITED STATES OF AMERICA.

Defendant.

## COMPLAINT

### I. JURISDICTION

1. This Court has jurisdiction under the Tucker Act, 28 U.S.C. § 1491. Plaintiff raises claims arising under federal statutes and military regulations. The money-mandating statutes are 37 U.S.C. § 204(a) (Military Pay Act) and 10 U.S.C. § 1201 (Disability Retirement and Compensation).

2. If successful in this action, Plaintiff would be entitled to monetary relief in excess of $10,000.00.

### II. THE PARTIES

3. Mr. Richard P. Watson served in the United States Army and is a combat veteran of operations in Iraq. He was adversely affected by decisions of Defendant.

4. Defendant is the United States of America.

### III. STATUTE OF LIMITATIONS AND EXHAUSTION OF ADMINISTRATIVE REMEDIES

5. 28 U.S.C § 2501 requires the filing of a claim in this Court within six years after the claim first accrues.

6. Mr. Watson's claims accrued on July 11, 2008, when he was involuntarily discharged from the U.S. Army.

7. On or about March 12, 2012 Mr. Watson filed a permissive application for the correction of his military records with the Army Board for the Correction of Military Records ("ABCMR").

8. On October 18, 2012 the ABCMR granted Mr. Watson's application in part and denied in part.

9. Mr. Watson has exhausted his administrative remedies with respect to the claims raised herein.

### IV. STATEMENT OF FACTS

10. Mr. Watson enlisted in the U.S. Army on September 9, 2004.

11. He served until July 11, 2008, when he was involuntarily separated for misconduct.

12. His Military Occupational Specialty ("MOS") was 19D10, Cavalry Scout.

13. Mr. Watson first deployed to Iraq from May 28, 2005 through September 28, 2005, and then again from August 10, 2007 to December 20, 2007.

14. He was awarded the Good Conduct Medal for his service.

15.    On September 6, 2006, while stationed in Vilseck, Germany, Mr. Watson experienced the sudden onset of neurological symptoms while performing physical training.

16.    Mr. Watson suffered numbness in his left hand, face, and tongue, and was unable to see correctly through his left eye.

17.    The Veterans Administration subsequently confirmed that this episode was the first manifestation of Multiple Sclerosis ("MS"), from which Mr. Watson continues to suffer.

18.    Mr. Watson received immediate medical evaluation and was admitted to Amberg Hospital, Germany, where he remained for 10 days

19.    The medical records reflect a diagnosis of Optic Neuritis.

20.    Radiologic studies showed central nervous system lesions (brain) with no cerebrospinal fluid inflammation.

21.    The German physicians recommended a follow-up MRI examination in three months.

22.    The Army then placed Mr. Watson on a restrictive physical profile.

23.    On October 17, 2006 Mr. Watson experienced a repeat of neurological symptoms and was taken by ambulance to Amberg Hospital.

24.    A medical note from the Army (CPT James L. Duncan, Physician's Assistant) states that Mr. Watson was experiencing "significant left sided weakness with hand squeeze...facial weakness on the left side of face with smiling noted drooping mouth...tongue deviates to the right, uvula rises midline. ...My working assessment is

3

probable stroke or transient ischemic attack (TIA) with the possibility of many other lesions including occult mass or demyelinating disease."

25. Amberg hospital radiologic examination showed "unchanged representation of isolated cerebral lesions in white matter right" and other concerning findings. They "assumed" a diagnosis of "chronic inflammatory central nervous system disease."

26. After his discharge from hospital, the Army placed Mr. Watson on a T3 (H) physical profile.

27. After the initial onset of his MS, Mr. Watson suffered from indistinct vision and strongly reduced left eye vision.

28. A military Chronological Record of Medical Care ("CRMC") note dated October 13, 2006 reflects that Mr. Watson was seen for "decreased vision, OS, possibly due to stroke, Sept 09-Sept 15." The report states a diagnosis of "Optic Atrophy."

29. A CRMC note of October 16, 2006 stated that "patient is using a patch OS in order to see properly with OD, use patch all the time."

30. A CRMC note of October 18, 2006 states a diagnosis of "Optic Atrophy."

31. A CRMC note of October 23, 2006 states "OS decreased vision after history of possible stroke, pt is being seen by local Neurologist, OS red decreased 50% of OD, positive afferent pupillary defect, decreased color, please rule possible causes."

32. A CRMC note of November 22, 2006 notes diagnoses of "Optic Atrophy" and "Optic Neuritis."

33. Mr. Watson returned from leave in January 2007 and was assigned to the Vilseck Law Center to assist soldiers and their families with income tax preparation and other administrative matters.

4

34. Mr. Watson's superiors were very pleased with his work and sought to have him reclassified as a paralegal and retained at the law center.

35. Despite Mr. Watson's medical conditions, the Army again deployed him to Iraq in September 2007. On September 29, 2007 Mr. Watson was conducting a foot patrol and was injured by an Improvised Explosive Device ("IED") blast.

36. The blast and flying debris knocked Mr. Watson to the ground and injured his back. He has experienced headaches approximately three times per week since the explosion.

37. Mr. Watson voiced concerns to his first sergeant about his medical issues and that he should not be in Iraq.

38. In the night of October 10, 2007, two weeks after the IED blast, Mr. Watson fell unconscious at the Forward Operating Base ("FOB") in Iraq.

39. His assigned rifle was located approximately 20 feet away from where he was found unconscious.

40. Mr. Watson was taken to the Aid Station for medical evaluation.

41. On November 1, 2007 the Army charged Mr. Watson under Article 15 (Summarized) of the Uniform Code of Military Justice ("UCMJ") for having "wrongfully disposed" of his weapon.

42. Mr. Watson was found guilty and punished with restriction and 14 days of extra duty.

43. He did not appeal the Article 15 because he believed it would only make matters worse for him.

44. Mr. Watson took leave in the United States from December 2, 2007 through December 20, 2007.

45. Upon his return to Vilseck, Germany, Mr. Watson was informed that he was to re-deploy to Iraq on December 23, 2007.

46. Mr. Watson informed his Non-commissioned Officer in Charge ("NCOIC") and others that he continued to experience neurological problems such as vision deficit, and also needed to see behavioral health for depression, for which he had been treated in Iraq.

47. On the morning of December 23, 2007, Mr. Watson refused to board a van to take him to the airport for transport to Iraq.

48. A CRMC note of December 26, 2007 states that behavioral health officers in Iraq had recommended that Mr. Watson return from deployment to Iraq after the September 27, 2007 IED blast.

49. The note also states that behavioral health officers in Iraq understood that Mr. Watson had performed well at the Vilseck legal center and believed that he would do better by remaining with that organization rather than re-deploy to Iraq.

50. The note also reflected Mr. Watson's diagnoses of Optic Atrophy and Optic Neuritis.

51. On or about January 25, 2008 Mr. Watson collapsed in his room and was rushed to a civilian hospital in Amberg, Germany.

52. On January 31, 2008, while hospitalized, two Army lawyers came to Mr. Watson's room and informed him that he was being charged under the UCMJ for missing movement to Iraq.

53.    On the advise of his detailed Army defense counsel, Mr. Watson pled guilty at a Special Court Martial.

54.    The Army sentenced him to reduction in rank to E-1 and imprisonment for 28 days.

55.    The Army involuntarily discharged Mr. Watson for misconduct on July 11, 2008, "Under Other Than Honorable Conditions."

56.    On October 9, 2008 the Veterans Administration determined that Mr. Watson's military service was honorable for purposes of benefits and medical care. According to the VA:

> When reviewing the available evidence of record, it could not be established that Mr. Watson engaged in a pattern of persistent and willful misconduct. Of the two offenses, in particular, the charge of wrongfully disposing of a firearm, the evidence showed this to be an incident where Mr. Watson' personally assigned weapon was misplaced for a short indeterminate amount of time and that Mr. Watson was actually unconscious at the time of the "wrongful disposal". Additionally, the weapon had actually been found and turned in to the proper authority a short time later.

57.    Concerning the charge that Mr. Watson unlawfully missed movement to Iraq, the VA concluded:

> ... the evidence of record shows that Mr. Watson at that time was suffering from situational and contextual depression based upon intermittent harassment and alienation by members of his unit. He had been diagnosed by the Theater Medical Care Provider, Brady Alexander-Rothwell, with an Adjustment Disorder With Mixed Emotional Features on October 13, 2007, and then with a Chronic Depressive Personality Disorder, by Dr. Cliff Hopewell on October 23, 2007.

58.    The VA also confirmed Mr. Watson's diagnosis of Multiple Sclerosis. According to Peter W. Pick, MD:

> I can state with 100% medical certainty, this patient suffered an attack of multiple sclerosis in September -- October 2006 when serving on active duty in the U.S. Army at Wielseck, Germany. He continues to have chronic neurological deficits due to secondary progressive multiple sclerosis, and made a partial recovery from this attack. He was absolutely correct in his refusal to return to Iraq in late December 2007, since he had not recovered from the attack of multiple sclerosis by that time; and he has still not recovered from the attack of multiple sclerosis that occurred in September -- October 2006.

59. The VA currently rates Mr. Watson as 100% disabled.

60. On or about March 12, 2012 Mr. Watson applied to the ABCMR for the correction of his military records.

61. In his application Mr. Watson requested that the ABCMR correct his records as follows: (a) Void his discharge and separation dated July 11, 2008; (b) Administratively reinstate Mr. Watson to active duty effective July 12, 2008 with backpay and allowances; (c) Restore Mr. Watson to the grade of E-4 effective May 2, 2008; (d) Refer Mr. Watson to a Medical Evaluation Board for Army disability evaluation processing; and (e) Award Mr. Watson the Purple Heart Medal for concussion injuries sustained as a direct result of enemy action.

62. The ABCMR convened on October 18, 2012 and granted Mr. Watson's application as to the award of the Purple Heart Medal. The board denied all other requested relief.

63. The ABCMR concluded that "... the evidence of record confirms that [Mr. Watson] was never issued a permanent "3" profile, and he was never diagnosed with any medical issue/disorder that required referral to an MEB/PEB during his active duty service."

64. The board further concluded, "Notwithstanding his doctor's statement in February 2009, there is no evidence that shows the applicant was diagnosed with optic neuritis or MS while he was on active duty."

## V. LEGAL CLAIMS

1. **THE ABCMR ERRONEOULSY FOUND THAT THE ARMY WAS NOT REQUIRED BY LAW TO REFER MR. WATSON TO A MEDICAL EVALUATION BOARD.**

65. Paragraphs 1 through 64 are incorporated herein by reference.

66. Army Regulation ("AR") 40-501 establishes the medical standards for retention and criteria for the referral of soldiers to a Medical Evaluation Board, the first step in the Army Physical Disability Evaluation System.

67. AR 40-501, Chapter 3-15, addresses conditions of the eyes that are <u>cause for referral</u> to a MEB. It provides:

> ... c. <u>Atrophy of the optic nerve due to disease</u>. ... g. Residuals or complications of injury or disease, when progressive or when reduced visual acuity does not meet the criteria stated in paragraph 3–16 e.

68. Chapter 3-30 addresses neurological conditions that are <u>cause for referral</u> to a MEB:

> e. <u>Multiple sclerosis</u>, <u>optic neuritis</u>, transverse myelitis, and similar demyelinating disorders.

69. Chapter 3-3 governs the disposition of soldiers who do not meet retention standards due to injury or illness. It provides:

> Soldiers with conditions listed in this chapter who do not meet the required medical standards will be evaluated by an MEB as defined in AR 40-400 and will be referred to a PEB as

9

    defined in AR 635–40 with the following caveats:

    a. USAR or ARNG/ARNGUS Soldiers not on active duty, whose medical condition was not incurred or aggravated during an active duty period, will be processed in accordance with chapter 9 and chapter 10 of this regulation.

    b. Soldiers pending separation in accordance with provisions of AR 635–200 or AR 600–8–24 authorizing separation under other than honorable conditions who do not meet medical retention standards will be referred to an MEB. In the case of enlisted Soldiers, the physical disability processing and the administrative separation processing will be conducted in accordance with the provisions of AR 635–200 and AR 635–40.

70. Those provisions of law required the Army to refer Mr. Watson to a MEB no later than October 13, 2006, when the Army diagnosed him with Optic Nerve Atrophy.

71. Civilian physicians in Germany diagnosed Mr. Watson with Optic Neuritis on October 17, 2006, which also required MEB processing.

72. Had the Army referred Mr. Watson to a MEB in October 2006, when it became lawfully obligated to do so, he would not have been deployed to Iraq in September 2007 and would not have incurred court martial charges in January 2008.

73. Medical examination through a MEB likely would have resulted in the diagnosis of MS, which carries a minimum disability rating of 30%.

74. Mr. Watson should have been medically retired.

75. The ABCMR's finding that the Army was not required to place Mr. Watson into the Army Disability Evaluation System was arbitrary, capricious, unsupported by substantial evidence, and contrary to law and mandatory procedure.

2. **THE ABCMR ERRONEOUSLY DETERMINED THAT THE ARMY'S DEPLOYMENT OF MR. WATSON TO IRAQ IN**

**SEPTEMBER 2007 AND ATTEMPTED DEPLOYMENT IN DECEMBER 2007 WERE LAWFUL.**

76. Paragraphs 1 through 64 are incorporated herein by reference.

77. AR 40-501 governs medical standards for deployment. Chapter 5-14(c) specifically provides:

> Active duty Soldiers who do not meet the medical retention standards in chapter 3 of this regulation must be referred to an MEB/PEB for a fitness-for-duty determination.

78. Mr. Watson did not meet the medical retention standards of AR 40-501, Chapter 3, due to his diagnoses of Optic Nerve Atrophy and Optic Neuritis, made on October 13, 2006, and October 17, 2006, respectively.

79. Under the deployment standards of AR 40-501, Chapter 5-14, the Army was required to refer Mr. Watson to "an MEB/PEB for a fitness-for-duty determination."

80. The Army did not do so and therefore unlawfully deployed Mr. Watson to combat in September 2007.

81. The ABCMR's finding that the Army's deployment of Mr. Watson to combat was proper is arbitrary, capricious, unsupported by substantial evidence, and contrary to law and mandatory procedure.

### 3. MR. WATSON'S REFUSAL TO DEPLOY ON DECEMBER 23, 2007 WAS LEGALLY JUSTIFIED.

82. Paragraphs 1 through 64 are incorporated herein by reference.

83. Under the law of the Uniform Code of Military Justice, a defense to the charge of disobeying an order (here, missing movement) is that the order conflicts with a military regulation. United States v. Roach, 29 M.J. 33 (USCMA, 1989).

84. Mr. Watson was charged with disobeying an order under Article 92 UCMJ.

11

85. The Army's order to Mr. Watson to re-deploy to Iraq was unlawful because it directly conflicted with AR 40-501, chapters 3-3 and 5-14.

86. Those provisions of law <u>required</u> the Army to refer Mr. Watson to a MEB for medical evaluation.

87. Under AR 40-501, Chapter 5-14, Mr. Watson was medically non-deployable.

88. The Army did not refer Mr. Watson to a MEB, and the order to re-deploy thus was unlawful.

89. Because the Army's order to Mr. Watson to board a van and aircraft for re-deployment to Iraq was unlawful, Mr. Watson committed no offense and was wrongly charged and convicted.

90. The Army's charge and conviction of Mr. Watson was contrary to law. His discharge for misconduct--commission of a serious offense--therefore was unlawful.

91. The ABCMR's finding that Mr. Watson presented "no evidence that shows the order to redeploy to Iraq on 23 December 2007 was an unlawful order" was arbitrary, capricious, unsupported by substantial evidence, and contrary to law.

**RELIEF REQUESTED**

92. Mr. Watson respectfully requests that the Court order Defendant to provide Mr. Watson the following relief:

(a) Void his discharge and separation dated July 11, 2008;

(b) Administratively reinstate Mr. Watson to active duty effective July 12, 2008 with backpay and allowances;

(c) Restore Mr. Watson to the grade of E-4 effective May 2, 2008; and

(d) Refer Mr. Watson to a Medical Evaluation Board for disability evaluation processing.

Respectfully submitted,

The Law Office of Raymond J. Toney
986 Losoya Drive
Woodland, CA 95776
Tel: 530-668-0984
Fax: 530-309-7457
E-mail: rjtoney@rjtlaw.net

Counsel for Plaintiff

November 13, 2012